IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 8, 2005

## STATE OF TENNESSEE v. PATRICIA MARIE JENSON[1]

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-A-308     Steve R. Dozier, Judge**

---

### No. M2003-02848-CCA-R3-CD - Filed June 21, 2005

---

The appellant, Patricia Marie Jenson,[2] was convicted by a jury in the Davidson County Criminal Court of child neglect and possession of drug paraphernalia. She received a total effective sentence of four years, to be served on community corrections. On appeal, the appellant challenges the sufficiency of the evidence supporting her conviction for child neglect and the sentence imposed by the trial court on that offense. Upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court are Affirmed**.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which J.C. MCLIN, J., joined. JOSEPH M. TIPTON, J., filed a dissenting opinion.

C. Leann Smith, Nashville, Tennessee, for the appellant, Patricia Marie Jenson.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy H. Eisenbeck and Brian K. Holmgren, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The proof at trial revealed that a Drug and Prostitution Unit with the Metropolitan Police Department (Metro) received information regarding sales of crack cocaine at 6106 Neighborly Drive

---

[1] The indictment also lists the aliases "Patricia Marie Mineer," "Lisa Claire Chamberlain," and "Patricia Marie Komisar."

[2] The record reflects that the correct spelling of the appellant's surname is "Jensen." However, we will use the spelling utilized in the indictment.

in Nashville, a very small residential home. On September 13, 2000, a confidential informant made a controlled buy at the residence and reported back to police. Based upon the information obtained during the controlled buy, police obtained a search warrant for the residence.

Sergeant Antoinette Regnier, the leader of the drug unit, testified that at approximately 10:00 a.m. on September 14, 2000, prior to the execution of the search warrant, a "checkup buy" was made at the residence. During the checkup buy, the confidential informant confirmed that the suspected crack cocaine dealer, Keith Tyree Sanders, was at the residence. Additionally, the confidential informant related that there was a woman matching the appellant's description and a young child in the residence.

Approximately one hour later, ten police officers entered the residence to execute the search warrant. There were approximately eleven people in the residence, and they were all smoking crack cocaine. Sergeant Regnier opined that the residence was "a crack house." She noticed several "crack pipes" laying around and recalled that there was an "overwhelming crack-cocaine smoke that was inside the residence." Her eyes immediately began to water, and she found it difficult to breathe. Sergeant Regnier said the smell was disgusting, comparing the smell to "male cat urine." Sergeant Regnier saw the appellant and a child whom the appellant identified as her two-year-old son in the living room area where the concentration of smoke was the strongest. The child acted like a "[t]ypical child, terrified, clinging to the parent." The child was dressed in a shirt and shorts, was barefoot, and was "filthy dirty." The living room floor was littered with the remnants of broken glass "crack pipes." The appellant stated that Sanders was the child's father. There were no other children in the residence.

Sergeant Regnier stated that every window and door in the small house was closed. She maintained, "I've probably executed close to two-hundred search warrants; and this is one of the, if not the, smokiest house I've ever been in. We had to immediately open all the doors and windows." Police moved the occupants outside for processing because they were unable to breathe in the house. Sergeant Regnier testified:

> I had concern for everybody's health and well-being. This is the only time that I can recall that we actually took everybody out of the house, before we'd even thoroughly search them, because of the smoke in the house.
>
> For one, it was so bad, you could barely breathe in there. I don't wanna inhale crack cocaine in my lungs. . . .
>
> I mean, I just wanted out of the house; I wanted the child out of the house; I wanted my officers out of the house; and I wanted the people that were under arrest out of the house. I mean that was what was the safest for all of us.

While waiting outside, the appellant's child "was all over the place, to the point that we finally just put him in the back seat of a police car, not because he was under arrest but, you know, to try to contain him a little bit." The child was "hyperactive," and the appellant "had no control over him at all." Sergeant Regnier explained that the child's hyperactivity was unusual because during search situations, children typically are scared and cling to their parents due to the noise and large number of strangers. Sergeant Regnier recalled that the child was hungry, but there was no food in the house for him. One of the officers got fast food for the child, and the child ate. Sergeant Regnier theorized, "I don't even believe he could speak at all." Sergeant Regnier acknowledged that the child was not taken to the hospital. However, she did call both the Department of Children's Services (DCS), who dispatched a case worker, and the appellant's father. The appellant's father took custody of the child.

Detective Michael Moss of Metro stated that he had been involved in the execution of more than one hundred search warrants. The instant case was "probably one of the worst [smoke-wise], because the house was so small." Detective Moss stated that police were unable to follow their usual practice of completing their paperwork inside the house; they had to take a table outside to complete the paperwork because the smoky condition of the house was intolerable. Detective Moss explained that crack cocaine smoke smelled like "dirty cat litter." He stated that even though he smoked one and one-half packages of cigarettes daily, the smoke in the house bothered him.

Detective Jason Rosalia of Metro also participated in the execution of the search warrant. Upon entry into the residence, Detective Rosalia noted that all of the occupants were "[s]itting there, either high or smoking crack." He described the amount of smoke in the residence as "terrible," and he found the smoke difficult to tolerate even though he smokes a package of cigarettes per day.

After fifteen or twenty minutes following their initial entry, police were able to enter the residence to execute the search warrant. During the search, police found numerous crack pipes, two hundred dollars' worth of crack cocaine, and several loose pills of the drug Paxil.

Jill Neely testified that she was at 6106 Neighborly Drive during the execution of the search warrant. Neely stated that the appellant and the appellant's son were also at the residence. Neely stated that the house was very smoky because people were almost constantly smoking crack cocaine.

Wesley Anderson, who was also at the residence during the execution of the search warrant, testified that he was bothered by the child being at the residence "[b]ecause of the activity that was taking place," namely the selling and smoking of crack cocaine.

Dr. Christopher Greeley, a pediatrician at Vanderbilt University Medical Center, was called as an expert witness. Although Dr. Greeley had never examined the appellant's child, he stated that he was very familiar with the effects of crack cocaine on children. Dr. Greeley asserted that "[t]he most effective way to get cocaine into anybody's system is to actually inhale it into your lungs." He explained that "inhaling cocaine is a very efficient way of getting cocaine to the brain, where . . . most of its effects are." Dr. Greeley further explained that if a child were exposed to the passive

smoke of "aerosolized cocaine . . . there's a good chance, if in an environment were able to breathe, even for a short period of time, they would have some evidence of cocaine in their system." Moreover, the doctor opined that "children exposed to the same dose would have a higher level [of cocaine in their system], 'cause it can't go anywhere else, as it would be in an adult."

Dr. Greeley stated that "one of the challenges of pediatrics, is that children can't tell you what's going on . . . especially in what we call 'pre-verbal,' or children probably younger than four or five, it's very difficult because they may have a behavior that we see, and you have to figure out what that's trying to tell you." Dr. Greeley testified that crack cocaine can have many various effects on a person, including cardiovascular problems, central nervous system problems, psychiatric problems, respiratory problems, or behavioral problems. Specifically, Dr. Greeley asserted that "cocaine in general can [affect behavior] from just being more agitated and – and jittery, to having really psychosis and breakdown." Moreover, Dr. Greeley stated that all children who test positive for cocaine have "some effect. It may be subtle, but it is some." Finally, Dr. Greeley opined that "the greater the exposure, the longer the duration, the more likely [a child would be affected by cocaine smoke.]"

The appellant's father, Jack Jensen, testified that he owned the shoe store where the appellant worked. On September 14, 2000, the day the search warrant was executed, he received a call from an officer asking him to take custody of the appellant's child. He asserted that the child was normal, energetic and mischievous, as he usually was. Jensen noted no unusual mannerisms exhibited by the child.

Anthony Jones, an employee of Jensen's shoe store, testified that he drove Jensen and Jensen's wife to pick up the child. Jones stated that he often drove the appellant and that he had driven her to 6106 Neighborly Drive on previous occasions. Jones also stated that he had met the appellant's child on many occasions. He maintained that on September 14, 2000, the appellant's child "was normal. He was running around the front yard. They were letting him play with a drum."

Cheri Lindsley, an early childhood professional employed by Tennessee State University, testified that she knew the appellant and her child through church. She testified that in Fall 2000, the child was not age-appropriate in his speech mannerisms, but the child was age-appropriate in play and intelligence.

Finally, Sbonnie Spear, the director of Blakemore Children's Center, testified that the appellant's child was in a program at the center. At the time of trial, the child had been in the program for two years. She stated that the child was age-appropriate and was very well-behaved. However, she noted that in the past four weeks, the child began taking "medication for ADHD."

Based upon the foregoing proof, the jury found the appellant guilty of child neglect and possession of drug paraphernalia. The trial court sentenced the appellant to concurrent sentences of four years for the child neglect conviction and eleven months and twenty-nine days for the drug paraphernalia conviction. The trial court suspended the appellant's sentence and placed her on

community corrections. On appeal, the appellant challenges the sufficiency of the evidence and the sentence imposed on her child neglect conviction.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, the appellant challenges her conviction for child neglect. She has phrased her challenge in two ways: (1)whether the evidence is sufficient to support her conviction for child neglect, and (2) whether the trial court erred in not granting a judgment of acquittal on the child neglect charge at the conclusion of the State's proof and at the conclusion of the defense's proof. This court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Therefore, we will address the appellant's complaints as a challenge to the sufficiency of the evidence supporting her conviction for child neglect.

Tennessee Code Annotated section 39-15-401(a) (2003) provides that "[a]ny person who knowingly, other than by accidental means, . . . neglects [a child under eighteen years of age] so as to adversely affect the child's health and welfare" has committed an offense. Further, if the child is six years of age or less, the offense is a Class D felony. Id. In the instant case, there is no dispute that the appellant's child was two years old at the time of the offense. Additionally, the evidence is uncontroverted that the appellant and the child were at the "crack house" when the search warrant was executed and that they had been at the residence for at least an hour prior to the execution of the search warrant. Thus, we must determine whether the evidence is sufficient to prove that the child's health and welfare were adversely affected by the exposure to the crack cocaine smoke.

In State v. Mateyko, 53 S.W.3d 666, 671-72 (Tenn. 2001), our supreme court explained that "before a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." Further, "a mere risk of harm in the neglect context is . . . insufficient." Id. at 671. In the instant case, Sergeant Regnier testified that the residence was filled with crack cocaine smoke. She stated that the smoke made breathing difficult and caused her eyes to water. Police were forced to take the occupants of the residence, including the child, outside in order to escape the smoke-filled residence. Sergeant Regnier recalled that the child was "hyperactive" and the appellant "had no control over him" once he was outside. She opined that this behavior was not the typical behavior she had observed in children during such situations. Additionally, Dr. Greeley testified that inhalation was the most effective way for crack cocaine to affect the brain. Further, Dr. Greeley stated that there was a great likelihood that exposure to passive crack cocaine smoke will have an effect on a child. He specifically noted that exposure to cocaine can produce behavioral and developmental problems. Dr. Greeley also stated that the effects of crack cocaine could be immediate, prolonged, or delayed. Finally, Spears testified that the child had recently started taking medication for ADHD. We conclude that the foregoing evidence, while not overwhelming, was sufficient to sustain the

appellant's conviction for child neglect.

## B. Sentencing

The appellant raises two issues concerning the sentence imposed for her child neglect conviction. First, the appellant challenges the length of the sentence imposed. Specifically, the appellant complains that the trial court erred in applying certain enhancement factors and in failing to apply any mitigating factors. Next, the appellant contends that the trial court erred in sentencing her to community corrections instead of probation.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2003). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in her own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of her sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

As a general rule, a court should begin a sentencing determination at the presumptive minimum, then "enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e). As we noted earlier, neglect of a child less than six years old is a Class D felony. Tenn. Code Ann. § 39-15-401(a). The presumptive sentence for a Class D felony is the minimum sentence within the appropriate range. See Tenn. Code Ann. § 40-35-210(c). The appellant was sentenced as a standard Range I offender, and on appeal, does not challenge this designation. The range of punishment for a standard offender convicted of a Class D felony is two to four years. See Tenn. Code Ann. § 40-35-112(a)(4) (2003). Accordingly, the presumptive sentence for the appellant's Class D felony conviction was four years. Id.

At the sentencing hearing, the State presented the testimony of Dr. Bruce Philip Levy, the chief medical examiner for Davidson County. Dr. Levy testified that he reviewed the autopsy reports of two sons born to the appellant prior to the birth of the victim in this case. The appellant's first son died when he was three months old. The appellant's second son died within one year of the first son, also at the age of three months. The babies were both born addicted to narcotics, specifically opiates. The death of the first son was attributed to sudden infant death syndrome (SIDS). The death of the second son was listed as "undetermined" because of the death of his sibling a year earlier. Dr. Levy maintained that the likelihood of multiple child deaths to a single caretaker is extremely small.

Yet, Dr. Levy did not attribute the deaths of the babies to foul play. Instead, Dr. Levy opined that if the appellant was using drugs at the time of the babies' deaths, the likelihood of neglect or accident would be increased.

The appellant testified that while she was pregnant with her previous sons, she was prescribed methadone, an opiate, by a physician. The methadone was to treat the appellant's addiction to painkillers. The appellant admitted that she made a "poor choice" in taking her two-year-old son to the residence on the day the search warrant was executed, but she maintained that she had taken him to visit his father. She stated that in September 2000 she was using crack cocaine "off and on." Upon further questioning, the appellant conceded that she had gone to the residence to use crack cocaine.

However, the appellant testified that she was undergoing treatment for her fourteen-year addiction to drugs. She admitted that she had one relapse in May 2001 when she again used cocaine. Nevertheless, she had completed programs and classes sponsored by Renewal Works and Renewal House, and she had moved into a halfway house for continued assistance with her addiction. The appellant testified that her son had been returned to her, and he was doing "excellent" in school. The appellant stated that she had maintained steady employment and was optimistic about the future.

Based upon the foregoing testimony, the evidence presented at trial, and the appellant's presentence report, the trial court found the existence of the following enhancement factors:

> (2) the appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (9) the appellant has a previous unwillingness to comply with the conditions of a sentence involving release in the community;[3] and
>
> (16) the appellant abused a position of trust.

Tenn. Code Ann. § 40-35-114(2), (9), and (16) (2003). The trial court found no mitigating factors and imposed a four year sentence. The trial court ordered that the sentence be served on community corrections.

On appeal, the appellant first complains that "[t]he trial court erred by using the fact that the [a]ppellant had two previous infants die from Sudden Infant Death Syndrome or SIDS as an enhancement factor for previous criminal activity." Our review of the record reveals that the trial court did not consider the death of the appellant's two children as a basis for applying enhancement factor (2). Notably, the trial court recognized that the State was not arguing that the deaths were attributable to criminal behavior on the part of the appellant. The trial court explained that the

---

[3] The appellant does not challenge the application of this enhancement factor.

application of enhancement factor (2) was based upon the appellant's criminal history of at least four misdemeanor offenses and the appellant's admission of fourteen years of drug usage. We conclude that the trial court properly applied this enhancement factor and gave it great weight.

Next, the appellant complains that the trial court improperly applied enhancement factor (16), that the appellant abused a position of trust. The appellant argues that "it is clear from the testimony of the alleged victim that the Appellant was there caring for the child at all relevant times." Initially, we note that the appellant's child, the victim in this case, did not testify at trial or the sentencing hearing. Accordingly, it is unclear to whose testimony the appellant is referring. Furthermore, taking the child to a "crack house" and exposing the child to the smoke of crack cocaine can not be considered properly caring for the child. The appellant admitted that she took her child to the residence so that she could smoke crack cocaine. We conclude that the trial court also correctly applied this enhancement factor. See State v. Sandy Marie McKay, No. M2002-03066-CCA-R3-CD, 2004 WL 483237, at *4 (Tenn. Crim. App. at Nashville, Mar. 12, 2004).

The appellant argues that the trial court erred in not mitigating her sentence under Tennessee Code Annotated section 40-35-113(13) (2003),[4] the "catch-all" provision of the statute, based upon the rehabilitative efforts she has made since the offense and her remorse. Initially, we note that there was evidence in the record that the appellant has made an effort to overcome her addiction to drugs. The trial court recognized that the appellant was continuing to receive treatment for her fourteen-year addiction to drugs. Nevertheless, the court found no mitigating factors. We conclude that the trial court acted within its discretion in refusing to mitigate the appellant's sentence on the basis of her rehabilitative efforts. See State v. Barry Waters Rogers, No. M1999-01358-CCA-R3-CD, 2000 WL 1336488, at *6 (Tenn. Crim. App. at Nashville, Sept. 15, 2000). Regardless, even if this mitigating factor was applicable, we conclude that it was entitled to little weight.

Regarding the appellant's claim that the trial court should have considered her remorse, we note that "genuine, sincere remorse is a proper mitigating factor." State v. Williamson, 919 S.W.2d 69, 83 (Tenn. Crim. App. 1995). However, a trial court must determine the credibility of a defendant's claims of remorse before the mitigating factor may be properly applied. See State v. Graylin Burton, No. M1999-01997-CCA-R3-PC, 2001 WL 166361, at *3 (Tenn. Crim. App. at Nashville, Feb. 16, 2001). The only proof in the record of the appellant's remorse were her self-serving statements. Moreover, the appellant did not specifically request the trial court to mitigate her sentence because of her remorse. We cannot conclude that the trial court abused its discretion in this regard. See Rogers, No. M1999-01358-CCA-R3-CD, 2000 WL 1336488, at *6.

Therefore, based upon the foregoing, we conclude that the trial court did not err in imposing the maximum sentence of four years.

Finally, the appellant summarily argues that the trial court erred in "sentencing [the appellant]

---

[4] Tennessee Code Annotated section 40-35-113(13) provides that a trial court may find as mitigation "[a]ny other factor consistent with the purposes of this chapter."

to Community Corrections, rather than State probation." However, the appellant has failed to support this contention with references to the record, any argument, or citations to authority. Accordingly, we conclude that the appellant has waived this issue. <u>See</u> Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7).

### III.  Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE